**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 14-CR-60047-MARTINEZ**

**UNITED STATES OF AMERICA**

v.

**KETUT PUJAYASA,**

**Defendant.**

_____/

**MOTION FOR AN UPWARD DEPARTURE AND VARIANCE FROM THE SENTENCING GUIDELINE RANGE**

The United States of America, through the undersigned Special Assistant United States Attorney, hereby files this Memorandum in support of a request for an upward departure pursuant to U.S.S.G. § 5K2.3 ("Extreme Psychological Injury"), and 5K2.8 ("Extreme Conduct"). The Government is also seeking an upward variance based upon the factors set forth in 18 U.S.C. § 3553(a).

It is the Government's position that a five-level upward departure and/or variance would result in a total adjusted offense level of 40, which, with a Criminal History Category I, correlates with an advisory Sentencing Guideline range of 292-365 months.

**I. CASE BACKGROUND**

On February 14, 2014, victim, hereafter referred to as CLW, a United States citizen, was physically and sexually assaulted aboard the Holland America MS Nieuw Amsterdam, while sailing in international waters. The vessel

1

had departed from Port Everglades in Broward County, Florida on February 9, 2014 and returned to Port Everglades on February 16, 2014.

On February 13, 2014, close to midnight, CLW returned to her stateroom alone and changed into a grey tank top shirt with black and white shorts. She then turned off the lights and proceeded to go to bed. As CLW was falling asleep, an unidentified male, later identified as PUJAYASA, began choking and punching her repeatedly. CLW continually attempted to scream for help and resist the violent attack but the subject was relentless with his assault and attempts to silence her. CLW was violently struck with several unknown items all over her body.

PUJAYASA strangled CLW with several items including a telephone cord and the cord to her curling iron. Throughout this violent encounter, CLW bit PUJAYASA's hand when he placed it in her mouth and she struck PUJAYASA in his genital area. Fearing for her life and believing the subject's intent was to kill her, CLW also used a cork screw in an attempt to stab the subject.

The attack continued onto the stateroom's balcony. While on the balcony, PUJAYASA attempted to throw CLW overboard. The violent encounter then proceeded back to the interior of the state room where the violent assault continued. CLW was rendered unconscious at least once during the attack. CLW was eventually able to flee her stateroom and run down the corridor until she encountered an unknown passenger who rendered aid.

CLW was treated by the ship's medical staff for serious bodily injuries and consented to a sexual assault examination. Later that morning the cruise ship docked in Roatan, Honduras.  Due to the severity of CLW's injuries and the life threatening nature, she was transported via air ambulance to a South Florida hospital.

A passenger who first made contact with CLW in the corridor immediately after the assault rendered first aid.  He witnessed CLW exit her cabin wearing only a tank top covered in blood.  The passenger also noted that CLW had a curling iron wrapped and tangled around her neck and/or hair.  He described CLW as having black eyes and visible bruising around her neck and shoulders. Fearing death was imminent, CLW asked the passenger to relay to her family how much she loved them.

On February 16, 2014, PUJAYASA, was interviewed on board the Holland America MS Nieuw Amsterdam, which was docked at Port Everglades, Broward County, Florida.  PUJAYASA was advised of his *Miranda* rights, waived his rights to have his attorney present and provided the following statement:

PUJAYASA confirmed that he is a citizen of Indonesia and is employed as a room service attendant with Holland America.  PUJAYASA advised that he delivered breakfast to a stateroom, as requested by a passenger, later identified as CLW.  He knocked three different times before the passenger acknowledged him.  While still outside the door, PUJAYASA heard a female voice state, "Wait a minute, son of a bitch!"  The female passenger then opened the door.

3

PUJAYASA then asked her if he could come in. She replied, "yes." He entered the room, placed the food tray on the table and left the stateroom.

PUJAYASA stated that the passenger's comment of "son of a bitch" was offensive to his parents and himself. He stated he was angry and upset the rest of the day. PUJAYASA never notified his immediate supervisor or any other manager of this incident.

Later that evening, PUJAYASA returned to CLW's stateroom and knocked on the door. He left after no response. PUJAYASA stated that he then walked to the Lido deck located on deck 9 in an attempt to locate the passenger who insulted him to punch her in the face for insulting him that morning. However, as he approached deck 9, PUJAYASA says he realized it was too crowded and decided to leave.

PUJAYASA then returned to CLW's stateroom, knocked on the door and used his company issued master key to enter the stateroom. PUJAYASA was off duty and was not authorized to enter any passenger's stateroom. Upon entering the stateroom, PUJAYASA searched for the passenger he was seeking revenge upon. Because the passenger was not in her stateroom, PUJAYASA says he secreted himself on the balcony until the passenger returned. While on the balcony, PUJAYASA fell asleep in a chair.

Later that evening, PUJAYASA re-entered the stateroom from the balcony and observed an individual asleep in the bed. He stated he immediately choked and punched the individual repeatedly. In turn, CLW resisted the attack and

4

attempted to defend herself. Throughout the duration of the attack, PUJAYASA admitted to striking the victim with items accessible to him within the stateroom including a laptop and a curling iron. PUJAYASA further acknowledged that during the attack he utilized the telephone cord and the curling iron cord to strangle the victim in an attempt to silence her. Unable to silence CLW, PUJAYASA inserted his hand into her mouth thus sustaining injuries to his hand that were visible during the interview.

PUJAYASA admitted that during the struggle he was able to forcibly remove CLW's clothing below her waist. He also admitted to removing his clothes below the waist in order to have forcible anal sex with CLW. He said he did this to punish CLW for the disrespectful comments made earlier. PUJAYASA could not achieve an erection, therefore, he forcibly digitally penetrated CLW's anus. CLW then continued to fight for her life by all means available including striking PUJAYASA's exposed genitals as well as utilizing a cork screw in an attempt to stab him.

PUJAYASA stated that the attack eventually continued onto the balcony. CLW screamed for help as PUJAYASA attempted to throw her over the balcony into the ocean. PUJAYASA stated that because he was unable to silence CLW, he attempted to throw CLW overboard to conceal his involvement. PUJAYASA knew the ship was underway and any attempts to locate CLW would be extremely difficult in hours of darkness.

PUJAYASA ultimately panicked when he heard knocking on CLW's stateroom door and ceased the attack so he could flee the room. PUJAYASA subsequently fled the stateroom by jumping from balcony to balcony along the exterior of the ship, while still naked below the waist. PUJAYASA entered an occupied stateroom and fled to the interior of the ship.

Following the attack CLW's medical diagnosis included the following:

1. Closed skull fracture
2. Non displaced anterior left maxillary fracture with minimal fluid level in the maxillary sinus
3. L2 transverse process fracture (spine fracture)
4. Traumatic ecchymosis (ruptured blood vessels causing an accumulation of blood) of neck
5. Bruised kidney
6. Hand contusion
7. Eyelid contusion
8. Elbow forearm abrasion
9. Human bites

**A. Departure for Extreme Psychological Injury Under § 5K2.3**

Section 5K2.3 allows a court to depart from the Guidelines heartland range when "a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense. The policy statement to § 5K2.3 provides, in pertinent part:  If a victim or victims suffered psychological injury much more serious than that normally resulting from commission of the offense, the court may increase the sentence above the authorized guideline range....Normally, psychological injury would be sufficiently severe to warrant application of this adjustment only when there is a

substantial impairment of the intellectual, psychological, emotional, or behavioral functioning of a victim, when the impairment is likely to be of an extended or continuous duration, and when the impairment manifests itself by physical or psychological symptoms or by changes in behavior patterns.

Here there is ample evidence of the extreme nature of CLW's psychological injuries. CLW has had multiple professional assessments by psychiatrists and she has been diagnosed with post-traumatic stress disorder, chronic anxiety, severe depression, insomnia, hypervigilance and obsessive-compulsive disorder. For a majority of these disorders she requires medication. CLW has feelings of fear and helplessness and has both exaggerated startle responses and recurrent distressing thoughts of the attack. She requires constant companionship. She cannot be alone. Her husband and mother alternate spending time with her.

The victim has been prescribed a variety of medication including Prozac (an antidepressant); Wellbutrin (another antidepressant): Perphenazine (anti-psychotic drug); Klonipin (for sleep); Gaunfacine ( antihypertensive drug); Progestrone and estrogen cream (for hormone deficiency as a result of the attack).

Prior to the Defendant's attack CLW was a gymnastics teacher and a very accomplished Ariel Acrobat. Neither of which she is able to do presently.  CLW has problems concentrating. Her cognitive performance on current tests indicate that she is functioning below her capacity, it is believed because of the brain injuries she experienced either through direct trauma (blunt force) or through

7

hypoxia (from strangulation or both). It is not known how long she was unconscious or how much oxygen deprivation to the brain occurred during the assault. However, she did suffer multiple blows to the head during the attack. She was also hit in the head with objects during the assault and the Defendant also "snapped" her neck in an attempt to break it. Prior to the attack CLW was also a professional photographer and now she unable to gain employment in that area. She continues to have flashbacks, sleep disturbances, problems with concentration which has not only affected her career but has also caused stress to her marriage. Clearly this demonstrates a substantial impairment of CLW's intellect, as well as her, psychological and emotional well-being.

The court in U.S. v. Anderson, 5 F.3d 795 (5th Cir. 1993), remarked that while not always the case, the heinousness of the defendants' conduct was in some respects the other side of the same coin as victim's psychological harm, and the outrageousness of the defendants' actions in turn supported the district court's upward departure under U.S.S.G. § 5K2.3. One may infer some psychological harm to the victim from the conduct of the defendants, the court reasoned, and the repeated rapes and threats of death gave concrete substance to the victim's unrebutted claims of psychological injury. In such circumstances, the court opined, the district court could conclude that the victim's psychological harm was also greater than that suffered by most victims of sexual abuse. In deciding the issue, the court advised, the psychological harm to the victim was measured against that suffered by victims of "ordinary" sexual abuse crimes; the

8

standard was not the psychological injury that would be considered the normal result of extreme sexual abuse and related conduct such as that exhibited by the defendants.

In <u>United States v. Begaye, 635 F.3d 456, 463 (10th Cir.2011)</u>, the Court in deciding to upwardly depart found that the record was rife with evidence of the extreme nature of the victim's psychological injuries. The district court had before it multiple professional assessments—uncontested by Mr. Begaye—diagnosing the victim with post-traumatic stress disorder and chronic anxiety, and indicating that she suffered from recurrent dreams and hallucinations that required medication. As a result of her trauma, the victim, according to one professional, "was not oriented for person, place and time." Another described her as "fearfully dependent, socially anxious, and protectively sad."

In this case the psychological testing reflects that CLW's cognitive ability is impaired as a result of the incident. Her processing speed for example is below normal scores. The testing also reflects confused thinking and significant identity problems, emotional instability as a result of the assault. A full neurological evaluation with DTI-MRI was therefore recommended to assess cognitive damages from the head trauma CLW experienced during the assault.

Although CLW is in various medical and psychological therapies, and she is on medication, she continues to have difficulties functioning in her daily

activities. Prognosis given the seriousness of her injuries suggest that she will need medical attention for a long time for even partial recovery and it is not known if she will ever fully recover.

### A. Departure for Extreme Conduct Under § 5K2.8

The policy statement to § 5K2.8 provides: If the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim, the court may increase the sentence above the guideline range to reflect the nature of the conduct. Examples of extreme conduct include torture of a victim, gratuitous infliction of injury, or prolonging of pain or humiliation.

In this case the Defendant's conduct was more heinous, cruel, brutal and degrading to the victim than that of other perpetrators of aggravated sexual abuse and attempted murder. Here, the Defendant attacked CLW with the specific intent to punish, harm and ultimately kill. The Defendant's attack was relentless and involved attempted suffocation, strangulation and potential drowning. The Defendant's actions were not just done to murder CLW but were done in a way to inflict pain and suffering on CLW while attempting to murder her.  The Defendant's conduct was clearly not contemplated in construction of the guidelines for attempted murder and/or aggravated sexual abuse.  The crime of attempted murder can be committed by shooting at someone and missing. The crime of aggravated sexual abuse can be committed by a sexual assault without the violence and gratuitous infliction of injury that occurred in this case.

Here, the Defendant entered the victim's stateroom while it was empty. He hid on the balcony until she returned and it was not until the victim was lying in her bed, asleep that he began his attack. This is by far the worst and most terrifying of all attacks a woman can suffer. It was not until the victim lay asleep and helpless in bed that the Defendant began his cowardly attack. The victim did not know the Defendant and had done nothing to knowingly provoke him. She went to bed not even contemplating such a violent attack. Once he began his attack, he attempted to choke her and he violently stuck her about the head and face. He strangled her with several items including a telephone cord and the curling iron cord. The victim had to fight for her life, and but for her amazing strength the Defendant would have killed her.  The Defendant dragged the victim to the balcony and attempted to throw her overboard, and, again, it was only her physical strength that kept her from a certain death had he been successful. Several times throughout the attack the victim was rendered unconscious. We know from the Defendant's admissions that it was during one of those times of unconsciousness that he attempted to anally penetrate her and, when he could not get an erection, he digitally penetrated her. This attack was deliberate and done with pure malice. The Defendant had planned and plotted his revenge on the victim the entire day. It was brutal, heinous, relentless, cruel and degrading to the victim. When the victim was finally able to flee her stateroom she still had the curling iron wrapped around her neck. The Defendant admitted that the only reason he stopped his attack on the victim was

that he got scared when he heard knocking on the stateroom door. This was not a spontaneous eruption of anger.

In this case the Defendant's actions did constitute gratuitous infliction of injury. The Defendant attempted to kill the victim by beating her, strangling her with a cord, "snapping" her neck to break it, and trying to throw her overboard. She fought for her life during the attack and believed she was going to die. Even after she escaped from her room, she was convinced she was going to die. She told people that came to her rescue in the hallway outside her room to tell her family that she loved them because she believed that even though she had survived the attack she would not live to see her family again.

The Court in United States v. Thomas, 293 Fed. Appx. 971(3d Cir. 2008) granted an upward variance pursuant to U.S.S.G. § 5K2.8 finding that Thomas had forced the victim to make a horrifying choice: be sexually assaulted again or leap from a speeding vehicle. The Court then concluded that the departure for extreme conduct was warranted because of the "pure fear and terror that the victim suffered."

It is the Governments position that the defendant's conduct in this case was more egregious than the usual sexual abuse offense. It involved multiple incidents of strangulation to the point of unconsciousness so he could engage in forced anal sex. It was by the Defendant's own admissions that we learned he did this to punish the victim. The Defendant's conduct in this case was clearly not contemplated by the Guidelines. In addition, as in the victim in the above cited

12

case, CLW's psychological harm was also greater than that suffered by most victims of sexual abuse. The Defendant in this case let himself in her room, he secreted himself on the balcony and did not enter her stateroom and begin his attack until she was asleep in bed.   CLW had no idea such an attack was coming. She did not know the Defendant and had done nothing to knowingly provoke him. As a result of the Defendant's actions CLW has been diagnosed with post- traumatic stress disorder, obsessive-compulsive disorder, chronic anxiety, hypervigilance, insomnia and severe depression. She requires constant companionship. Physically she has headaches, pain to her neck, problems swallowing, pain to her lumbar region, dental pattern changes, facial scars and displacement of teeth. Her life has been forever changed by the actions of this Defendant.

### B. Consideration of the 18 U.S.C. § 3553(a) factors

Lastly the government requests that an upward variance be given after consideration to the sentencing factors as enumerated in 18 U.S.C. § 3553(a) which include the following:

(1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)   the need for the sentence imposed—

(A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B)   to afford adequate deterrence to criminal conduct;

>> (C) to protect the public from further crimes of the defendant; and
>>
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

In this case the Court is required to consider the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to apply just punishment for the offense. *See* 18 U.S.C. § 3553(a)(2)(A). All of these factors weigh heavily in favor of imposing a sentence greater than the advisory Sentencing Guideline range of 168-210 months. The mindless acts of sexual assault and attempted murder are always incredibly serious criminal offenses; however, as outlined in the previous sections of this memorandum the circumstances in this case make them even more egregious. The crime of attempted murder can be committed by shooting at an individual and missing. In this case, the Defendant's actions that constitute attempted murder were extremely brutal. He beat her relentlessly and strangled her to the point of unconsciousness on several occasions. He attempted to throw her overboard. This brutal, heinous conduct was not contemplated by the sentencing commission when determining the guideline range for attempted murder.

The Court must also consider the need to provide adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. *See* U.S.C. § 3553(a)(2)(B)(C). The Government is of the opinion that the defendant should be incarcerated for much longer than 168-210 months in order to protect innocent people and avoid the devastation that occurred in this case to

14

a sleeping, defenseless female. The Defendant's trigger in this case was so slight and his anger so great it is impossible to determine or predict what other comments may trigger such a violent attack.

Government's position is that a five-level upward departure under Section 5K2.8 and Section 5K2.3 is appropriate, warranted, and reasonable. A five-level upward departure results in a total adjusted offense level of 40, Criminal History Category I, which correlates with an advisory Sentencing Guideline range of 292-365 months.

        Respectfully submitted,

        WIFREDO FERRER
        UNITED STATES ATTORNEY

        By: s/ *M. Catherine Koontz*
        M. Catherine Koontz
        Special Assistant United States Atty
        Court Id A5501929
        500 Broward Blvd., 7th floor
        Fort Lauderdale, Florida 33394
        (954) 660-5940
        (954) 356-7336 (Fax)
        e-mail: ckoontz@usa.doj.gov

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on December 22, 2014, the undersigned electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

s/*M.Catherine Koontz*
M.CATHERINE KOONTZ
Assistant United States Attorney

17